WESTERN MASSACHUSETTS ELEC-TRIC COMPANY, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

The CONNECTICUT LIGHT & POWER COMPANY, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

Nos. 77-1328 and 77-1420.

United States Court of Appeals, First Circuit.

Argued Jan. 5, 1978.

Decided March 23, 1978.

Harold N. Mack, Boston, Mass., with whom Philip J. Moss and Morgan, Brown, Kearns & Joy, Boston, Mass., were on brief, for petitioners.

Anne H. Andrews, Atty., Washington, D. C., with whom John S. Irvin, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, and Elinor Hadley Stillman, Atty., Washington, D. C., were on brief, for respondent.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

These cross-petitions for review and enforcement of two orders of the National Labor Relations Board present the same legal issue in different factual contexts: whether an employer is guilty of an unfair labor practice when in the course of negotiating a new collective bargaining agreement it refuses to divulge to the union its prior costs in subcontracting out work that members of the bargaining unit are capable of performing.[1]

Local 455 of the International Brotherhood of Electrical Workers filed charges against Western Massachusetts Electric Co. ("WMECO") on July 2, 1975, and the Regional Director of the Labor Board issued an amended complaint several months later. After a hearing, an administrative law judge held that WMECO had violated 29 U.S.C. § 158(a)(5) by refusing to disclose certain information while negotiating a new contract with the union. On March 11, 1977, the Labor Board affirmed this decision and issued a cease and desist order requiring WMECO to disclose the requested data and restraining it from future violations.[2] An appeal to this court and cross petition for enforcement followed.

Locals 420 and 457 of the IBEW filed charges against Connecticut Light and Power Co. ("CL&P") on May 14, 1976, and a complaint was issued. An ALJ similarly found that CL&P had committed an unfair labor practice, and the Labor Board affirmed and issued a cease and desist order on May 31, 1977. The Second Circuit ordered the appeal transferred to this court pursuant to a stipulation of the parties, and the cross-petitions were consolidated with those in the WMECO case.

## FACTS—THE COMPLAINT AGAINST WMECO

This dispute arose during negotiations between Local 455 and WMECO concerning a collective bargaining agreement to take the place of the one expiring on July 1, 1975.

---

1. Section 8(a)(5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(5), states:

 (a) It shall be an unfair labor practice for an employer—

 * * * * * *

 (5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.

2. The Board modified the order in one respect, ordering WMECO to provide the union with "other information for the administration of any contract agreed to by the parties." The Board explained "[W]e are also of the view that the same information is necessary for the Union's administration of the contract. Accordingly, we shall provide in our order that such information, upon request, shall be made available." *See* pp. 107–108 *infra*.

WMECO traditionally had subcontracted out some work that its regular employees can and on occasion do perform, such as overhead line work, underground excavation and line installation, and tree trimming. The collective bargaining agreement then in effect required WMECO to use its own employees when performing certain underground cable work in the Berkshire area (the "Berkshire restriction"), but otherwise allowed the company free rein with regard to subcontracting. During the fall of 1974 WMECO had, at the union's request, launched an experiment of using regular employees to perform certain tree trimming work that ordinarily would have been contracted out. The company ended the experiment after a few months, informing the union both that the regular employees were not cheaper than the subcontractors, and that it did not intend to compete with its subcontractors.

At the first negotiating session over the new collective bargaining agreement on May 20, 1975, the company proposed to eliminate the Berkshire restriction. According to testimony of the union's bargaining agent, the company stated that the restriction was inefficient and uneconomical. At the next session on June 2, the union submitted its own proposal with regard to subcontracting. The union wanted to forbid subcontracting whenever regular employees were laid off or not fully utilized. Some layoffs had occurred before bargaining began, and the company warned the union that more might be expected. At the meeting where it presented its proposal, the union requested information as to total hours worked by subcontractors during the existing agreement and the amounts paid to these workers. A union spokesman explained to company negotiators that the union believed regular employees could do the work more cheaply than the subcontractors. According to the spokesman, one of the company negotiators asked if the union's proposal would apply even to short term subcontracting and, when informed that it did, declared that such a restriction would be inefficient and uneconomical.

At a negotiating session on June 24, the company orally informed the union of the hours worked by subcontractors, but refused to provide the cost information on the ground that it was not relevant. On June 26 the union renewed its request for the cost data in writing. On June 30 both parties withdrew their respective proposals as to subcontracting, but the union did not waive its claim to the information. The parties reached a new agreement on July 3, and during that day the company provided the union with a letter in response to the request for cost information. It stated:

The company feels that the cost of such outside contracting is not material to negotiations and, consequently, that we do not have to supply it.

Our refusal is not based on economic reasons, but on the fact that such information is not relevant to negotiations.

These proceedings followed.

### FACTS—THE COMPLAINT AGAINST CL&P

Beginning in the spring of 1976, CL&P and Locals 420 and 457 entered into negotiations over a collective bargaining agreement to replace the one expiring on June 1. The existing agreement contained the following clause:

Article XVI

Work regularly performed by employees covered by this Agreement will not be contracted out if it would result in loss of continuity of employment or opportunities for permanent promotions to job classifications covered by this Agreement.

At least since 1972 the locals had requested information from the company respecting subcontracting, and the company consistently had refused to disclose cost data on the ground that such information was not relevant to bargaining. Before negotiations on the 1976 contract began, the locals sent a letter to the company requesting the following information:

1. The name of each and every contractor & or subcontractor who performed work during the year 1975.
2. The type of work performed.

3. The number of people employed by the contractors on such work.

4. Total manhours worked by contractors [*sic*] employees.

5. A list of equipment used to perform the work.

6. The total cost of each job contracted out and a breakdown of the costs to the Company to complete the work.

The letter indicated the union's intention "to propose to the Company areas where our members can perform work now being performed by contractors more economically . . . ." The company agreed to provide most of the information, but refused to comply with the last two requests. With regard to the demand for cost information, the company replied, "There are many reasons why contractors are used on various projects. Therefore, the Company does not consider the cost data relevant for bargaining on this matter." The locals renewed their request for this information, and the company held to its earlier position.

The parties exchanged initial proposals for a new collective bargaining agreement on April 26, and among those forwarded by the union was a change in the existing subcontracting restriction.[3] Although most of the promised information was provided to the locals in the course of negotiations in May, the company remained adamant in refusing to pass on subcontracting cost data. A new collective bargaining agreement was executed July 15, in which the previous subcontracting limitation clause was carried over without change. By that time the locals had already begun to seek relief from the Labor Board.

PRINCIPLES APPLICABLE TO
BOTH CASES

The sole issue in each of these appeals is whether in the circumstances of each case the company violated its duty to bargain in good faith by refusing to disclose subcontracting cost information. This court recently addressed the principles applicable to the compulsory exchange of financial information between union and employer during bargaining in *Teleprompter Corp. v. NLRB,* 570 F.2d 4 (1st Cir. 1977). In our discussion of "the general obligation of an employer to provide information that is needed by the bargaining representative for the proper performance of its duties," *NLRB v. Acme Industrial,* 385 U.S. 432, 435–36, 87 S.Ct. 565, 568, 17 L.Ed.2d 495 (1967), we observed:

> "The 'general obligation' described in *Acme* extends in varying degrees of intensity throughout the many aspects of management-union relations, with accommodation being made between the union's urgent need for some types of information, such as wage data, and the employer's greater relative interest in preserving the confidentiality of other information, such as profitability data."

*Teleprompter Corp., supra,* 570 F.2d at 8. Information pertaining immediately to the mandatory subjects of bargaining—wages, hours, and other terms and conditions of employment, *see* 29 U.S.C. § 158(d)—is presumptively relevant and must be disclosed unless it "plainly appears irrelevant." *NLRB v. Yawman and Erbe Mfg. Co.,* 187 F.2d 947, 949 (2d Cir. 1951). Other kinds of information which a union believes might be useful in bargaining "need not be disclosed in the course of contract negotiations unless the bargaining representative first makes a showing that it is specially relevant to the bargaining taking place." *Teleprompter Corp., supra,* 570 F.2d at 9 (citing *International Woodworkers v. NLRB,* 105 U.S.App.D.C. 37, 263 F.2d 483 (1959)). In such cases, a union must do more than merely claim that the data would be helpful in performing its tasks. *Id.* But if an employer itself puts the information in contention—as by asserting an economic inability to pay an increase in wages where a union seeks profitability data—then the employer must divulge the information. *Id.* at 9 (citing *NLRB v. Truitt Mfg. Co.,* 351

---

**3.** In place of the term "Work regularly performed," the locals proposed to substitute "Any work performed."

U.S. 149, 152–53, 76 S.Ct. 753, 100 L.Ed. 1027 (1955)).

 Neither of the Labor Board decisions at issue here treated the cost data sought by the unions as directly related to a mandatory subject of bargaining and therefore presumptively relevant. For example, the ALJ wrote in the CL&P case: "I agree with the [employer's] contention that not all information is presumptively relevant to the bargaining process, and that in areas such as contracting and subcontracting an employer is not obligated to furnish information unless such precise relevance has been established." The ALJ in the WME-CO decision applied a similar analysis.[4] Rulings of the Board and case law support this conclusion. Following the decision of the Supreme Court in *Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1965), that contracting out of unit work that results in the extinction of the bargaining unit is a mandatory subject of bargaining, the Labor Board quickly sought to cut off precipitous extension of that ruling to other forms of subcontracting.[5] In *Westinghouse Electric Corp.*, 150 N.L.R.B. 1574 (1965), the Board held that an employer was permitted unilaterally to implement contracting out of work capable of being performed by unit employees when the subcontracting was part of the employer's usual method of conducting its operations and did not have a significant impact on unit employees' job interests. *Id.* at 1576. Subsequent judicial decisions have made clear the importance of impact on the bargaining unit as a factor in determining whether particular subcontracting constitutes an issue over which bargaining is compulsory. Where an employer's decision to contract out work takes away jobs previously performed by members of the bargaining unit, the employer must bargain over the decision. *UAAAIW v. NLRB*, 127 U.S.App.D.C. 97, 381 F.2d 265 cert. denied, 389 U.S. 857, 88 S.Ct. 82, 19 L.Ed.2d 122 (1967). Where subcontracting does not divert from the bargaining unit jobs performed by unit employees, however, an employer need not bargain with the union over the decision. *NLRB v. King Radio Corp.*, 416 F.2d 569 (10th Cir. 1969), cert. denied, 397 U.S. 1007, 90 S.Ct. 1234, 25 L.Ed.2d 420 (1970); *Westinghouse Electric Corp. v. NLRB*, 387 F.2d 542, 547–48 (4th Cir. 1967); *District 50, UMW v. NLRB*, 358 F.2d 234 (4th Cir. 1966); see *Puerto Rico Telephone Co. v. NLRB*, 359 F.2d 983, 987 (1st Cir. 1966); cf. *Japan Air Lines Co., Ltd. v. IAM*, 538 F.2d 46 (2d Cir. 1976); *Leeds & Northrup Co. v. NLRB*, 391 F.2d 874, 879 (3d Cir. 1968). It is not enough that the unit employees may be concerned about lost work; if diminution in available work cannot be attributed to the subcontracting, it cannot be made an issue over which bargaining is compulsory. See *District 50, UMW, supra*, 358 F.2d at 237.[6]

---

**4.** He wrote:

"Though a union need not make a special showing of relevancy and necessity to obtain information about employment of employees within the bargaining unit, where the request for information concerns matters outside the bargaining unit, as in the case at bar, the Union must ordinarily demonstrate more precisely the relevancy of the data requested."

**5.** The Court in *Fibreboard* made clear its holding was limited to the facts of the case:

"We are thus not expanding the scope of mandatory bargaining to hold, as we do now, that the type of 'contracting out' involved in this case—the replacement of employees in the existing bargaining unit with those of an independent contractor to do the same work under similar conditions of employment—is a statutory subject of collective bargaining under § 8(d). Our decision need not and does not encompass other forms of 'contracting out' or 'subcontracting' which arise daily in our complex economy."

379 U.S. at 215, 85 S.Ct. at 405.

**6.** To be sure, dicta in *Westinghouse Electric Corp., supra*, 150 N.L.R.B. at 1576–77, suggests that subcontracting of any work capable of being performed by unit employees, even where the subcontracting does not have a present impact on the unit, may be a mandatory subject of bargaining in some situations. Whatever the merits of that position, our research has disclosed no case where the Labor Board or any reviewing court has sought to apply such a principle, and the decisions of the ALJs in the appeals at bar do not so hold. The Labor Board in its argument before us has not contended that the kind of subcontracting involved here is a mandatory subject of bargaining. Given the possibly wide-ranging implica-

Although the parties are thus agreed that the employers here were not guilty of an unfair labor practice unless the unions have shown that the information requested was precisely relevant to the bargaining that took place, they vigorously dispute whether that showing was made out in either case. Because the facts of the two cases differ, separate analysis is necessary.

## ANALYSIS AND CONCLUSIONS AS TO WMECO

■ As noted above, at various times both before and during its bargaining with the union, WMECO indicated that restrictions on its power to subcontract were uneconomical. It cited economics as a reason (although not the only one) for discontinuing its experiment of using unit employees for tree trimming, and criticized the union's proposal to limit subcontracting as uneconomical. Once having made such assertions, the duty to bargain in good faith required WMECO to provide, upon demand, such information as was reasonably necessary to substantiate them. *Teleprompter Corp., supra*, 570 F.2d at 11.

WMECO protests on this appeal that the union never made clear the reasons why it wanted the cost information, thereby preventing WMECO from evaluating the propriety of the request in light of the obligations imposed by law. The Labor Board found, however, that the circumstances of the negotiations with the union gave WMECO adequate notice that the requested information was related to various assertions by WMECO that restrictions on subcontracting were uneconomical. There was sufficient evidence to support a finding that WMECO had tied subcontracting to economics at the first bargaining session in 1975, and that at the very next session, the union both responded to the company's proposal and requested the cost information. Again at that second session the company made clear its belief that cost and subcon-

tracting issues were bound together. In light of these findings, the company appears to have had a sufficient basis for understanding the purpose of the union's request.

There is, it is true, some force to WMECO's further argument that the rationale expressed by the Labor Board in its decision was broader than that sanctioned by case law. The Board appears, at times, to have proceeded on the broader and, we believe, improper theory that subcontracting costs are always relevant in a collective bargaining context, once a union has made clear its intent to capture work previously contracted out. *See infra.* It did not seek to rely on *Truitt Mfg. Co., supra*, or other cases dealing with the relevance of information needed to substantiate an employer's assertions in the course of bargaining. But, although the Board may have applied a different rationale, ample basis exists in this record for a finding that the union needed subcontracting cost information to verify statements made by WMECO as to the economic necessity of removing restrictions on subcontracting. The evidence is clear that WMECO put costs in contention, and "the exact formulation used by the Employer in conveying this message is immaterial." *New York Printing Pressmen v. NLRB*, 538 F.2d 496, 500 (2d Cir. 1976). The special relevance of the information thus being established, it is unnecessary to determine whether other rationales would be available to support the Labor Board's result. In these circumstances, nothing would be gained by remanding to the Labor Board for reevaluation. *Compare Associated Grocers of New England, Inc. v. NLRB*, 562 F.2d 1333, 1337 (1st Cir. 1977). There is ample record support for the Board's order that WMECO disclose the subcontracting cost data which the union requested for bargaining purposes.

WMECO also attacks the portion of the Board's order that requires disclosure of subcontracting cost information for con-

tions of a decision to the contrary, the ramifications of which the Labor Board is in the best position initially to assess and evaluate, we feel constrained to assume, at least for the pur-

poses of this decision, that the employers were not required to bargain over the subcontracting at issue here.

tract administration purposes. The ALJ did not address the union's claim that it needed the data to police WMECO's compliance with the contract, and on the basis of the record before him we are unable to see how the information would be relevant to this purpose. The Labor Board nevertheless found, in summary fashion, that the information was necessary for contract administration and modified the cease and desist order accordingly. *See* note 2 *supra.* This action remains entirely unexplained, and indeed seems inexplicable in light of the Board's previous holding directly to the contrary in *Southwestern Bell Telephone Co.,* 173 N.L.R.B. 172 (1968). There the Board held that subcontracting cost information was irrelevant to the union's contract administration needs. It noted then, as is true in this case, that finding out whether the employer violated a contract restriction on subcontracting requires knowledge only of the extent and nature of that activity, not of the employer's purposes or motivations. In sum, there is absolutely no support in the record or findings of the Board for this portion of the order, and it therefore must be modified to delete all references to contract administration. As modified, the order will be enforced.

### ANALYSIS AND CONCLUSIONS AS TO CL&P

The record is quite different with regard to CL&P. Unlike WMECO, officials of CL&P never made any statements indicating that existing or proposed restrictions on subcontracting were uneconomical. There is no assertion that the information was necessary for substantiation purposes. Instead, the Labor Board advances a far broader theory. It argues that at least where job security is a genuine concern of the union, all information about an employer's subcontracting practices are relevant whether or not the subcontracting is responsible for work lost to the unit. According to the ALJ, in conclusions adopted by the Board,

"The [employer] further argues that the record evidence supports its conten-

tion that the Unions were not concerned in reality with protecting the work of the bargaining unit, but were really intent on capturing additional work. The [employer's] argument in this respect is bottomed on the phraseology of the Union's proposed amendment to Article XVI; and supposed admissions of the Union's [*sic*] agents in their testimony. It can be readily conceded that the Unions' proposed amendment would have further restricted the [employer's] authority to contract out work, but I find no persuasive evidence to support the contention that the Unions' agents admitted that the capture of additional work was their real objective. Even if established, however, I fail to perceive that such evidence would have any material bearing on the issue of relevancy. I know of no authority, and the [employer] has cited none, to substantiate the proposition that information is relevant only where the bargaining agent intends to use it solely for the purpose of maintaining the *status quo*, or that information is not relevant where the union intends to use it to expand the work potential of the bargaining unit employees."

Because unit employees were capable of doing the work currently contracted out, the Board argues cost information about the work must be disclosed.

Whether or not the locals' agents admitted their purpose was to capture additional work, the record is clear that CL&P's existing subcontracting practices did not divert any unit work, and that the aforementioned Article XVI protected the employees from such encroachment. The conclusion is inescapable that the work which was the object of the locals' interest was non-unit work that the locals sought to capture, possibly to mitigate the effects of work reduction attributable to entirely independent causes. It is in light of this fact that the locals' demand for cost information must be evaluated.

The Labor Board seeks to support its analysis of the relevance of this information by relying on two distinct lines of authority.

It attempts to compare this case to other situations where information about employees outside the bargaining unit has been held relevant to the concerns of representatives of those within the unit. *See NLRB v. Rockwell-Standard Corp.*, 410 F.2d 953 (6th Cir. 1969); *NLRB v. Goodyear Aerospace Corp.*, 388 F.2d 673 (6th Cir. 1968); *International Telephone and Telegraph Corp. v. NLRB*, 382 F.2d 366 (3d Cir. 1967), *cert. denied*, 389 U.S. 1039, 88 S.Ct. 777, 19 L.Ed.2d 829 (1968); *Curtiss-Wright Corp. v. NLRB*, 347 F.2d 61 (3d Cir. 1965); *Ohio Power Co.*, 216 N.L.R.B. 987 (1975), *enforced*, 531 F.2d 1381 (6th Cir. 1976) (mem.); *Hollywood Brands, Inc.*, 142 N.L.R.B. 304, *enforced*, 324 F.2d 956 (5th Cir. 1963) (mem.), *cert. denied*, 377 U.S. 923, 84 S.Ct. 1221, 12 L.Ed.2d 215 (1964). The Board also cites to cases where employers have been forced to divulge cost data relating to employee benefits. *NLRB v. General Electric Co.*, 418 F.2d 736 (2d Cir. 1969), *cert. denied*, 397 U.S. 965, 90 S.Ct. 995, 25 L.Ed.2d 257 (1970); *Sylvania Electric Products, Inc. v. NLRB*, 358 F.2d 591 (1st Cir.), *cert. denied*, 385 U.S. 852, 87 S.Ct. 87, 17 L.Ed.2d 80 (1966). None of the cases cited, however, apply to the problem presented here.

*Rockwell-Standard, Goodyear*, and *Curtiss-Wright* involved union investigations into the suspected diversion of bargaining unit work to employees who were outside the unit. The unions needed wage, job description, and related data for the outside employees to determine whether they were doing work properly performed by unit employees. *See also Acme Industrial, supra.* Here, by contrast, diversion of unit work is not a concern. In *International Telephone and Telegraph Corp., supra*, the unit sought seniority data about an entire class of non-unit employees who were potentially eligible to be transferred into the bargaining unit, thereby altering the seniority structure of the unit. Disclosure was ordered only as to those employees who were about to be transferred. *See also NLRB v. Western Electric, Inc.*, 559 F.2d 1131 (8th Cir. 1977). The union in *Ohio Power Co., supra*, expressly disclaimed any interest in cost information. In *Hollywood Brands, Inc.*,

*supra*, the Board ordered disclosure of the wages paid employees in factories outside the unit. This information was made relevant by statements of the employer expressing its intention to standardize wages throughout its factories. None of these situations exist here.

The other line of cases cited by the Labor Board also involved circumstances different from the case at bar. In both *General Electric* and *Sylvania* the union demanded to know the cost to the employer of particular benefit packages proposed as substitutes for wage increases in the course of collective bargaining. Both courts held that this data would significantly aid the bargaining process by enabling the unions to evaluate the desirability of an increase in benefits as against an equivalent wage increase. But the information demanded related to benefits to be received by the employees. Although the cost of the benefits was not itself a mandatory subject of bargaining, *see Sylvania Electric Products, Inc. v. NLRB*, 291 F.2d 128 (1st Cir.), *cert. denied*, 368 U.S. 926, 82 S.Ct. 360, 7 L.Ed.2d 190 (1961), the benefits themselves were and the cost information was shown to be closely related to them. Here, by contrast, the cost information relates to a subject which all agree is not a mandatory subject of bargaining, namely subcontracting that does not itself reduce the work traditionally performed by bargaining unit employees.

Although the ALJ professed to know of no authority supporting a distinction between restrictions on subcontracting that are necessary to preserve the status quo, and restrictions motivated only by a desire to capture additional work for the unit, just such a distinction appears to have been drawn to determine when particular forms of subcontracting do and do not constitute mandatory subjects of bargaining. The line of cases beginning with *Fibreboard*, and including the Board's own *Westinghouse Electric* decision, indicate that whether or not a union seeks only to preserve the status quo is a critical difference with respect to the duty to bargain. It should follow that this distinction is highly

**110**

relevant, if not dispositive, in information demand cases as well. Just as a union cannot compel an employer to bargain over subjects that fall outside the ambit of "wages, hours, and other terms and conditions of employment," it cannot bootstrap a demand for information relating to these non-mandatory matters by its unilateral assertion of interest. Some action of the employer is necessary to make this kind of information relevant to bargaining.

■ On the facts of this case, we can find no action of CL&P to justify disclosure of the information requested. Although CL&P voluntarily provided the locals with some information about its subcontracting practices, throughout the negotiations it consistently reserved its rights as to the cost information. CL&P did not hamstring the locals by insisting on bargaining over subcontracting while withholding pertinent information. In short, the Board does not and, the record indicates, cannot point to any statement, compromise or suggestion attributable to CL&P that raised costs as an issue. Instead CL&P has been confronted with a unilateral attempt by the locals to put subcontracting costs into contention. Under the principles expressed above, CL&P was under no obligation to respond, and its refusal to provide the information cannot be held an unfair labor practice. The order of the Board against CL&P will not be enforced.

*The order in No. 77–1328 will be enforced as modified. Enforcement of the order in No. 77–1420 is denied.*