**EQUITABLE GAS COMPANY,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 79–2530.

United States Court of Appeals,
Third Circuit.

Argued Sept. 15, 1980.

Decided Jan. 14, 1981.

---

9. The record does not reflect whether the inhabitants had licenses for any of these weapons.

Henry J. Wallace, Jr. (argued), Reed Smith Shaw & McClay, Pittsburgh, Pa., for petitioner.

William R. Stewart, Deputy Asst. Gen. Counsel, Richard Cohen (argued), N. L. R. B., Washington, D. C., for respondent.

Before ALDISERT, ROSENN and GARTH, Circuit Judges.

## OPINION OF THE COURT

GARTH, Circuit Judge.

This appeal requires us to review an order of the National Labor Relations Board which determined that the Petitioner, Equitable Gas Company, had refused to bargain over its decision to subcontract customer remittance work. We conclude that on this record, Equitable's subcontract with Mellon Bank was not a mandatory subject of collective bargaining, and therefore Equitable did not violate Sections 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. § 151 et seq. (1976).

### I

In order to increase its cash flow and save on overhead charges that might otherwise have to be passed on to consumers in a high energy cost context, Equitable entered into a contract with Mellon Bank on September 21, 1978, whereby, effective January 1, 1979, Equitable transferred to Mellon certain customer remittance work which theretofore had been performed by bargaining unit employees[1] in Equitable's Treasury Department. Prior to this transfer, Equitable had subcontracted out bargaining unit functions on several occasions, but at no time did these subcontracts result in any employee layoffs, although the bargaining unit jobs were eliminated.[2] Most significantly, in-house mail delivery has been permanently subcontracted to an independent company for the past nine years, resulting in the elimination of two bargaining unit messenger jobs. With regard to each subcontract, Equitable met with the union, informed the union of its decision to subcontract, and discussed the effects of the decision upon bargaining unit employees. No objection or protest was ever registered by the union respecting the contracting out of these collection functions.

The union, in turn, through negotiation of its collective bargaining agreements, had repeatedly, but unsuccessfully, sought to restrict Equitable's subcontracting right through collective bargaining. During negotiations in 1969–1970, 1971 and 1977, the union submitted to Equitable proposals which, if accepted, would have limited or prohibited Equitable from subcontracting any bargaining unit work. During the collective bargaining negotiations, these proposals were discussed, and in each instance were opposed by Equitable. Through the years, certain provisions in the collective bargaining agreements pertaining generally to transfers, lay-offs, reassignments, probations, displacements, and the like, were negotiated and agreed to by the parties.[3] At no time prior to the 1980 collective bargaining agreement, however, did Equitable ever

---

1. The International Brotherhood of Electrical Workers, Local Union No. 1956, AFL–CIO ("IBEW"), was and is the collective bargaining representative of about 320 Equitable employees, including the remittance clerks.

2. The record reveals that the Mellon arrangement was one of a series of subcontracts made with various banks, including Mellon, to handle customer remittance work performed by IBEW bargaining unit employees. These previous arrangements were made when Equitable closed seven of its branch offices over a 13 year period.

Other subcontracts let by Equitable involved the performance of functions such as keypunching, drafting, clerical work, and field work dealing with investigations and the delivery of discontinuance notices.

3. See, e. g., Art. IV, Sections M, N, and O of the 1977 Contract (A. 223–24).

agree to a subcontracting clause in its collective bargaining agreement with the union.[4]

Prior to Equitable's subcontract with Mellon, Equitable's remittance clerks physically opened the mail, separated the enclosed checks from the accompanying billing coupons, forwarded the coupons to the computer room for tabulation, and processed the remaining checks. After the clerks balanced the checks and coupons, they forwarded the checks to the cashier for deposit. The actual deposits were made in the bank the following day by a contract messenger service. Under this arrangement, Equitable could process in one day only sixty percent of the checks received on any given morning.

Under Equitable's arrangement with Mellon, customer remittances are forwarded directly to a "lock box" maintained by Mellon, where they are picked up by Mellon's employees, and processed throughout the night. The system is almost entirely automated,[5] resulting in an acceleration of at least two days in the processing of payments and crediting of deposits to Equitable's Mellon Bank account. The Mellon system is therefore superior to Equitable's former procedure in that it provides a more efficient service, resulting in an acceleration of, and increase in, Equitable's cash flow, as well as improved updating of customer accounts. This accelerated system provides Equitable with an additional $700,000 per day in available hard cash, which reduces Equitable's need to borrow money on the market.

Prior to entering into the Mellon subcontract, Equitable had four clerks processing remittances. One clerk position had become vacant early in August, 1978, and was not filled. The remaining three employees affected were transferred to other departments in Equitable. They obtained equivalent or higher paying positions by exercising their seniority rights as provided in the collective bargaining agreement. No other jobs were affected and Equitable did not lay off any employees as a result of the Mellon subcontract.

Representatives of Equitable met with the union on three separate occasions. On September 21, 1978, Equitable's Assistant Treasurer explained the advantages that would result from the arrangement with Mellon. On September 25, 1978, Equitable informed the union that negotiations with Mellon Bank had taken six to eight weeks

4. Prior to the argument in this case but after the briefs had been filed, Equitable and IBEW entered into a new collective bargaining agreement, effective from June 26, 1980 through June 2, 1982. Equitable moved to dismiss the NLRB's cross-application for enforcement of its order on the ground that this new agreement includes a clause governing Equitable's right to subcontract work, and therefore Equitable claimed the dispute underlying the NLRB's present order had become moot. The contract now provides:

> The Company will not contract out work that is regularly and customarily performed by the regular employees covered by this bargaining unit if such contracting out would cause, as a direct and immediate result, the lay-off of regular employees.

We reject Equitable's argument that the issues presented to us on this appeal are moot. Equitable has not agreed, and indeed vigorously opposes, the concept that under the relevant collective bargaining agreements, its subcontracts were subject to mandatory bargaining. Moreover, although its 1980 agreement with the union, which comes before us only in the context of a motion to dismiss and not as part of the record, precludes the practice of subcontracting if employees would be laid off, it is undisputed that the agreement here had no such provision. Furthermore, none of the remittance clerks whose work is now performed by the subcontractor Mellon have ever been laid off. Hence, there is a substantial difference between the circumstances giving rise to the Board's order and the company's present circumstances. In addition, the Board, in its Affidavit responding to Equitable's motion, asserts that the union at no time "traded off" its rights under the Board's remedial order so as to obtain the 1980 contractual concession from Equitable. We need not decide these issues, however, in light of our ultimate disposition.

5. The letters are mechanically opened, after which an operator physically separates the checks from the coupons. This physical separation by the operator is the only manual aspect of the entire operation; all other procedures are automated. The final product received by Equitable from Mellon is a magnetic tape showing all of the collections and a handmade deposit ticket.

to complete and that the remittance work contract had been signed with Mellon on September 21, 1978. The following day, the IBEW filed charges with the NLRB.

On October 16, 1978, when Equitable met with the union for the third time, the IBEW requested a copy of the Mellon contract and relevant cost data so as to enable the union to make a bid for remittance work on behalf of Equitable's employees. Equitable's Assistant Personnel Director rejected the union's request, stating that Equitable was not interested in obtaining any other "bids" for the job, as the cost of the Mellon operation was not a factor in the company's decision. The union representative walked out of the meeting and subsequently refused to discuss the matter further.

On November 28, 1978, the Regional Director issued a complaint alleging that Equitable had violated Sections 8(a)(1) and (5) of the Act by failing to bargain over its decision to enter into the contract with Mellon, and by refusing to provide the union with a copy of the Mellon contract. A hearing was held on February 9, 1979, before an Administrative Law Judge.

In his May 15, 1979 decision, the ALJ concluded that Equitable had violated Sections 8(a)(1) and (5) of the Act by not notifying the union prior to entering into the contract with Mellon, thereby depriving the union of an opportunity to bargain over Equitable's decision. The ALJ also determined that since Equitable had a duty to bargain over the contract, it should have provided a copy of the contract and the cost data sought by the union. The ALJ held that Equitable had committed independent Section 8(a)(1) and (5) violations by its refusal to supply this information. Moreover,

although the ALJ declined to grant the General Counsel's request that Equitable be ordered to rescind its agreement with Mellon so as to restore the *status quo ante*, he entered a remedial order which required that Equitable bargain with the union over future decisions to subcontract work performed by its employees.

On September 24, 1979, the Board affirmed the findings and conclusions of the ALJ respecting the Section 8(a)(1) and (5) violations, but rejected his recommendation that a *status quo ante* order was inappropriate. The Board perceived "no undue hardship" to Equitable if the Mellon contract was voided (A. 6). It therefore modified the order entered by the ALJ and directed Equitable to reinstate its remittance clerk operation.[6]

Section 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), provides, in pertinent part, that it is an unfair labor practice for an employer "to interfere with, restrain or coerce employees in the exercise of the rights guaranteed in section 157 . . . ."[7] Section 8(a)(5) makes it an unfair labor practice for an employer to refuse to bargain collectively. The Board charged that Equitable had violated both sections of the Act by refusing to bargain collectively over its contract with Mellon. Equitable concedes it did not bargain with the union when it entered into the Mellon contract, but maintains that it had no duty to do so.

## II

Equitable's petition thus presents essentially one critical question: is there substantial evidence to support the Board's findings which resulted in its determination that the Mellon subcontract was a mandatory subject of bargaining?[8] Our inquiry

---

6. Board member Truesdale was in agreement with the ALJ on all aspects of the decision, including the remedy. He therefore would not have required Equitable to rescind the Mellon contract or otherwise restore the *status quo ante*.

7. Section 157 prescribes, among other things, that employees shall have the right "to bargain collectively through representatives of their own choosing . . . ." 29 U.S.C. § 157 (1976).

8. Two other questions are presented in Equitable's petition. The answers to both depend upon our disposition of the primary question: was the subcontract a mandatory subject of bargaining? In Section III, *infra*, of this opinion, we address Equitable's refusal to supply a copy of its Mellon contract and underlying cost data to the union, which is the subject of the

must therefore initially focus on whether a subcontract of customer remittance work under the instant circumstances constitutes a mandatory subject of collective bargaining within the meaning of Sections 8(a)(1) and (5) of the Act. In answering that inquiry, we must evaluate Equitable's conduct in terms of the Act's purposes, those factors deemed relevant in determining the need to bargain over particular subcontracting agreements, and the particular facts and circumstances presented by the instant record.

### A.

The Declaration of Policy set forth in Section 1 of the Labor Management Relations Act, 1947, 61 Stat. 136, 29 U.S.C. § 141 (1976), stresses the need to avoid "industrial strife which interferes with the normal flow of commerce." It goes on to state that a purpose of the Act is to "provide orderly and peaceful procedures for preventing the interference" by either labor or management with the legitimate rights of the other. The Supreme Court recognized the Act's emphasis on the "mediatory influence of negotiation" in the settlement of industrial disputes in its landmark decision, *Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203, 210, 85 S.Ct. 398, 402, 13 L.Ed.2d 233 (1964). The court there addressed the subject of subcontracts as they impact upon collective bargaining principles.

In *Fibreboard*, the employer gave the union notice of its intention to subcontract all of its maintenance work upon the expiration of the then existing collective bargaining agreement. The company had determined that substantial savings would be effectuated by such an agreement. In granting the Board's petition for enforcement of its order to reinstitute the company's maintenance operations and to reinstate the employees who had been engaged in maintenance work, the Court held that subcontracting which involves "the replacement of employees in the existing bargaining unit with those of an independent contractor to do the same work under similar conditions of employment" is covered by the phrase "terms and conditions of employment", and is thus a mandatory subject of bargaining under Section 8(d) of the Act.[9] *Id.* at 215, 85 S.Ct. at 405. The Court, however, carefully articulated the parameters of its holding: "Our decision need not and does not encompass other forms of 'contracting out' or 'subcontracting' which arise daily in our complex economy." *Id.* at 215, 85 S.Ct. at 405.

Notwithstanding this caveat in the Court's opinion, Justice Stewart, joined by two other Justices, filed a concurring opinion in which he took pains to limit his

second question presented in Equitable's petition.

In light of our disposition, we need not reach the third question presented in Equitable's petition, which concerns the propriety of the Board's *status quo ante* order.

**9.** Section 8(d) of the National Labor Relations Act defines collective bargaining as "the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment...." 29 U.S.C. § 158(d) (1976).

In *Brockway Motor Trucks v. NLRB*, 582 F.2d 720, 725–26 (3d Cir. 1978), Judge Adams, writing for the Court, explained the content of a "mandatory subject of bargaining":

A matter falling within the scope of Section 8(d)—namely, one involving "wages, hours, and other terms and conditions of employment"—is a mandatory subject of bargaining. In practical terms, the elaboration of the identity of mandatory subjects of bargaining is crucial, for such matters must be discussed in bargaining sessions before any unilateral action with respect to them is taken. If, for example, an employer proceeds on its own without submitting a mandatory subject to the bargaining process, it violates its duty under the NLRA, and its professed good faith in so doing will have no bearing upon the legality of its action. Moreover, if one party insists on the inclusion of such a subject in a collective bargaining agreement, the other party is obligated at least to discuss it. The converse of these propositions is also true. A permissive subject of bargaining need not be discussed at the bargaining table, and one party may not compel the other to address it as a condition of executing a collective bargaining agreement.

(footnotes omitted).

endorsement of the majority opinion to the specific facts presented in *Fibreboard*. He emphasized the need for protecting managerial discretion with regard to those "decisions which are fundamental to the basic direction of a corporate enterprise," *Id.* at 223, 85 S.Ct. at 409. Stressing the narrow holding of the Court, Justice Stewart stated:

> The Court most assuredly does not decide that every managerial decision which necessarily terminates an individual's employment is subject to the duty to bargain. Nor does the court decide that subcontracting decisions are as a general matter subject to that duty.

*Id.* at 218, 85 S.Ct. at 407.

### B.

Following the *Fibreboard* decision, both the Board and various courts, when faced with "closing" or "subcontract" issues in a Section 8(d) context, inclined toward an approach which weighed the employees' interests against those of the employer. *See, e. g., Westinghouse Electric Corp. (Mansfield Plant)*, 150 N.L.R.B. 1574 (1965); *NLRB v. Royal Plating and Polishing Co., Inc.*, 350 F.2d 191 (3d Cir. 1965).

In *Westinghouse, supra*, the Board, one year after the Supreme Court's decision in *Fibreboard*, ruled that Westinghouse did not have to notify and consult with its union before contracting out work[10] that could be performed by its own employees. The Board, in emphasizing the need for flexibility in this area, set forth at least five relevant considerations which should be weighed in making such a determination:

> [B]earing in mind particularly that the recurrent contracting out of work here in question was motivated solely by economic considerations; that it comported with

the traditional methods by which the Respondent conducted its business operations; that it did not during the period here in question vary significantly in kind or degree from what had been customary under past established practice; that it had no demonstrable adverse impact on employees in the unit; and that the Union had the opportunity to bargain about changes in existing subcontracting practices at general negotiating meetings—for all these reasons cumulatvely, [sic] we conclude that Respondent did not violate its statutory bargaining obligation by failing to invite union participation in individual subcontracting decisions.

*Id.* at 1577.

*Royal Plating, supra*, involved a "plant closing" rather than a subcontracting arrangement. In that case, the court held that "an employer faced with the economic necessity of either moving or consolidating the operations of a failing business has no duty to bargain with the union respecting its decision to shut down." 350 F.2d at 196 (footnote omitted).

Thereafter, *Brockway Motor Trucks v. NLRB*, 582 F.2d 720 (3d Cir. 1978), traced the development and refinement of the *Fibreboard* doctrine through succeeding court decisions and Board interpretations. 582 F.2d at 727–731. Brockway had closed its Philadelphia facility, but had continued its operations in other areas. The court concluded that the determination as to whether an employer has a duty to engage in collective bargaining when shutting down a plant or a part of its operation, must "begin with the statutory commitment to collective bargaining and . . . proceed to balance the parties' interest in the decision at issue", focusing on the facts of each case. *Id.* at 731. The court in *Brockway* was unable to

---

**10.** Westinghouse contracted out the following work in the period covered by that proceeding: (1) about 400 maintenance subcontracts of which about 350 could have been performed by Respondent's maintenance employees; (2) about 800 contracts for tools and dies, most of which involved work within the capacities of employees in Respondent's tool-and-die department; (3) about 1,500 contracts awarded by the portable appliance division for the purchase of parts, of which 12 involved components previously manufactured at Mansfield; (4) about 5,000 contracts let by the major appliance department for purchase of components many of which could have been manufactured at the Mansfield Plant. *Westinghouse Electric Corp. (Mansfield Plant)*, 150 N.L.R.B. 1574, 1575 (1965).

utilize this balancing approach, however, because it determined that the record lacked the firm, factual underpinning deemed necessary for such an analysis. Hence, for this reason, the majority opinion denied enforcement of the Board's order.[11]

More recently, the balancing approach announced in *Brockway* was applied in *Electrical Products Division of Midland-Ross Corp. v. NLRB*, 617 F.2d 977 (3d Cir. 1980), another case involving the partial closing of a plant. In weighing the union's interest in protecting its members' livelihood against the employer's interest in implementing its economic decisions with minimal interference or financial loss, the court held that a duty to bargain about the partial closing existed. It did so after stressing that although the union might not have prevented the closing, it could have made suggestions to minimize the effect of the closing on the workers. No countervailing considerations on behalf of the employer had been shown which would have overcome the presumption in favor of a duty to bargain.

■ Thus, it is now settled in the jurisprudence of this Circuit that when issues of subcontracting and partial closings are confronted in the context of the National Labor Relations Act, an initial presumption arises that they are mandatory subjects of bargaining. Applying the balancing analysis formulated in *Brockway*, this presumption can be overcome only if it appears that the employer's interests outweigh the union's interests in a given situation. *See Midland-Ross, supra*, at 982. With these principles in mind, we turn to the record in this case.

### C.

■ The ALJ, concluding that Equitable had violated its duty to bargain, relied almost entirely upon the criteria articulated in *Westinghouse, supra*. Ostensibly, he sought to apply the factors considered in

*Westinghouse*, and to relate them to the Equitable-Mellon arrangement. We have difficulty, however, in accepting his analysis. First, having established the framework for his examination, the ALJ failed to address all of the factors as they are discussed in *Westinghouse*. Second, and of greater importance, the findings which he made, and which the Board affirmed, leading to the conclusion that the Equitable-Mellon arrangement was a mandatory subject of bargaining, are not supported by substantial evidence, and therefore cannot be sustained. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

■ *Westinghouse*, as we have previously observed, does not support a duty to bargain where the employer's unilateral action in subcontracting satisfies the following five criteria: (1) the recurrent subcontracting is motivated solely by economic considerations; (2) it comports with the company's traditional methods of conducting its business operations; (3) it does not vary significantly from prior established practices; (4) it does not have a demonstrable adverse impact on employees in the unit; and (5) the union had the opportunity to bargain about changes in existing subcontracting practices at general negotiating meetings.

### The First Three Westinghouse Factors

The first criterion mentioned in *Westinghouse* is that the employer be motivated solely by *economic considerations* in contracting out work on a *recurrent basis*. This subject was never addressed independently by the ALJ. The second factor identified in *Westinghouse* is that the subcontract arrangement comports with "the traditional methods" by which the employer conducts its business operations. 150 N.L.R.B. at 1577. The third criterion stated is that the subcontracting arrangement not "vary significantly in kind or degree from

11. Judge Rosenn dissented, largely because he believed that *NLRB v. Royal Plating and Polishing Co., Inc.*, 350 F.2d 191 (3d Cir. 1965), was controlling in that the closing of Brock- way's Philadelphia facility was solely for economic reasons; no employees were replaced with others; and no anti-union animus existed.

what had been customary under past established practices." *Id.* at 1577.

These three factors are interrelated, at least in the instant case, and we therefore deem it appropriate to discuss them together. The same evidence which relates to Factor No. 1, requiring an economic motivation on the part of Equitable for "recurrent contracting out of work", is relevant to Factor No. 2, Equitable's traditional methods of operation, and Factor No. 3, Equitable's past established practices.

It is undisputed that Equitable's decision to subcontract its remittance work to Mellon was wholly governed by economic concerns looking toward increased efficiencies and increased, as well as accelerated, cash flow. The Mellon procedure also resulted in accelerated and more current updating of customer accounts. Moreover, if the economic motivations emphasized in *Westinghouse* had been intended as a contrast to anti-union motivations, it is clearly evident that this implicit "criterion" has been satisfied as well, for the record discloses a complete absence of any anti-union animus on the part of Equitable. *See, e. g. Brockway, supra; Royal Plating, supra.* Although recent decisions of our court suggest that the existence of an economic motivation behind a major change in the direction of a company may not, in and of itself, justify absolving an employer of the duty to bargain, *see Brockway, supra,* 582 F.2d at 738–40; *Midland-Ross, supra,* 617 F.2d at 982–83, the presence of economic considerations is nevertheless an important factor to be weighed in balancing the interests of the employer and the union. *Cf. Royal Plating, supra,* 350 F.2d at 196 ("an employer faced with the economic necessity of either moving or consolidating the operations of a failing business has no duty to bargain with the union respecting its decision to shut down").

Nor is it disputed that the subcontracts let by Equitable for years prior to the Mellon arrangement were motivated by similar economic concerns, and indeed in no instance until the present one did the union ever contest Equitable's right to contract out the particular functions which were the subject of these subcontracts. Equitable emphasizes, that under these circumstances, the Mellon subcontract can hardly be characterized as a "new, unprecedented threat" to employees, as the ALJ characterized it (A. 16). The company points out that Mellon's subcontract was the sixteenth in a series of subcontracts made with various banks in connection with the performance of Equitable's customer remittance work. Equitable claims that in each of these instances, it followed identical procedures with respect to its notice to the union and its bargaining over the effects of the particular arrangement. The record supports Equitable's contention. Equitable's brief states:

> Moreover, it is uncontested that over the past fifteen years the Company has consistently contracted other bargaining unit work to outside companies and the identical procedure of notice and effects bargaining has been followed (A. 15, 102, 104). This subcontracting has routinely occurred "every day continuing on a daily basis" (A. 103–104), has involved various bargaining unit functions, such as key punching, drafting, clerical work and mail delivery, and has resulted in permanent removal of work from the bargaining unit (A. 99–100, 102, 218).

Brief for Equitable at 16.

The ALJ, while recognizing that "the appropriate bargaining unit . . . had not over the years been insulated from the subcontracting of work performed by its members" (A. 15), nevertheless sought to distinguish the Mellon arrangement from the previous Equitable subcontracts, and found that the Mellon subcontract involved a type of subcontracting that had not been customary under past established practice. He concluded that the Mellon arrangement posed a threat to unit employees "insofar as it represented the first instance where unit work was removed and classifications eliminated due to technological advance" (A. 16). We do not agree that the evidence supports this determination.

As Equitable argues, and as the record discloses, Equitable's subcontracting practices through the years neither lacked in continuity nor were of a sporadic, recurrent nature.[12] To the contrary, the reduction of remittance clerk positions in Equitable's Treasury Department through subcontracting has been an ongoing process. Even apart from subcontracting of various bargaining unit functions on different occasions, Equitable had also entered into a series of subcontracts with various banks when it closed several of its branch offices, and had previously subcontracted its in-house mail delivery operation, thereby permanently eliminating two bargaining unit messenger positions.[13] Moreover, the record reveals that the banks involved in the earlier fifteen subcontracts had developed a capacity for direct payment, (A. 91), which the Mellon subcontract entails.

Thus, our examination of the record fails to reveal substantial evidence supporting the ALJ's findings that Equitable's subcontracting operations were other than recurrent, that its decision to contract with Mellon varied significantly "in kind or degree from what had been customary under past established practice," *Westinghouse, supra,* 150 N.L.R.B. at 1577, and that the Mellon arrangement failed to comport with Equitable's "traditional methods by which [it] conducted its business operations," *id.* Indeed, the evidence is to the contrary, and in addition, it provides unequivocal support for Equitable's position that its motivation in entering the Mellon contract was dictated solely by economic considerations.

*Westinghouse's Fourth Factor: Detrimental Impact on Employees*

■ Although the *Westinghouse* decision does not single out any one of the five factors as being more significant than any other, a reading of subsequent subcontract cases impresses us that the most critical of the five criteria discussed in *Westinghouse* is the effect which the subcontract will have upon employees. *See, e. g., American Cyanamid Co. v. NLRB,* 592 F.2d 356 (7th Cir. 1979); *Brockway, supra; Western Massachusetts Electric Co. v. NLRB,* 573 F.2d 101, 106 (1st Cir. 1978); *Puerto Rico Telephone Company v. NLRB,* 359 F.2d 983, 987 (1st Cir. 1966); *District 50, United Mineworkers of America v. NLRB,* 358 F.2d 234 (4th Cir. 1966). Indeed, it appears that where there has been no adverse impact on existing working conditions an employer's decision to subcontract does not violate his obligations under Section 8(d) of the Act.

Here, the record clearly shows, and the ALJ accordingly found, that no layoffs resulted from the Mellon arrangement, which affected only three out of about 320 employees. The ALJ also found that the elimination of the remittance clerk jobs did not result in a diminution of earnings or loss of employment since the three affected employees were engaged by Equitable in other capacities, in which they received equal or greater salaries than they had formerly been paid.

Notwithstanding his findings that there were no layoffs and that the bargaining unit employees sustained no perceptible loss of employment or earnings, the ALJ found that the Mellon arrangement might generate a fear of future impairment of job opportunities. This "fear", which finds no expression in the record, led to the ALJ's conclusion that the employees suffered a significant detrimental impact by reason of the Mellon arrangement. His determination in this respect was predicated upon the nature of Equitable's past subcontracting experience, and resulted in the ALJ concluding that Equitable's action, even if *layoff free,* should not be condoned if it "radiates against established employment inter-

---

12. The ALJ found that Equitable's "overall practice of contracting out work in the instant bargaining unit was sporadic, compartmentalized, and something less than the oft-repeated, readily anticipated means of operation contemplated by the line of decisions following *Westinghouse.*" (A. 16)

13. *See* note 2, *supra* and accompanying text for the particulars of Equitable's subcontracting history.

ests in an unprecedented and fear inspiring fashion" (A. 15). We have earlier pointed out, however, that the ALJ's findings regarding Equitable's prior subcontracting experiences cannot be sustained, as they are not supported by the record. Thus, the very predicate upon which the ALJ determined that Equitable's employees were adversely affected, is gravely flawed.

The record facts are contrary to the findings and conclusions of the ALJ that the employees suffered by reason of the Mellon contract. Absent evidence to support a "demonstrable adverse impact on employees in the unit", *Westinghouse, supra*, 150 N.L.R.B. at 1577, we refuse to speculate about future impairment of work opportunity where the evidence does not support any such fact or conclusion.[14] *See, District 50, UMW, supra.*

Although we concede that the determination of what constitutes a "demonstrable adverse impact" may be difficult to explain, we are satisfied that where findings, fully supported by the evidence, reveal that no layoffs have resulted from the subcontracting practice and no diminution of earnings or loss of job opportunities have occurred, it cannot be said that the impact upon the employees was demonstrably adverse.

### *Westinghouse's Fifth Factor: Opportunity to Bargain at General Negotiating Meetings*

In adopting the *Westinghouse* analysis, the ALJ did not address directly the fifth factor discussed in *Westinghouse*, ". . . [did the union have] the opportunity to bargain about changes in existing subcontracting practices at general negotiating meetings . . .", *Westinghouse, supra*, 150 N.L.R.B. at

---

14. We have no occasion to decide whether Equitable's decision to subcontract with Mellon was solely an automation decision. Yet, we note that even where such automation decisions are unilaterally made by employers, it has been suggested by at least one commentator that the following standard should be utilized to determine if such a decision requires bargaining within § 8(d) of the Act:

[W]here a decision to automate will directly and foreseeably result in adverse impact on the bargaining unit or its members, it should

---

1577. The ALJ, however, did not focus on subcontracting as a bargaining issue in a negotiating context, but rather concentrated on whether the Union had "consciously yielded" or waived its right to insist on notice and bargaining. The ALJ's opinion addressing this issue reads:

As for the negotiating history, the record merely discloses that during contract renewal sessions in 1969, 1971 and 1977 the Union proposed bans on the subcontracting of unit work. The proposals were discussed, though opposed by Respondent, and later dropped by the Union prior to entry of each successive collective-bargaining agreement. Contrary to the Respondent, a Union's unsuccessful effort to obtain contract revisions imposing restrictions upon subcontracting greater than the duty of notification and consultation embodied in the Act, is not tantamount to a "conscious yielding." The more likely interpretation is that, in receding from a demand for more comprehensive restrictions, and joining an ultimate settlement of negotiations, the Union elected to rest upon its lesser statutory rights.[10] In sum, the Union's demands in past negotiations did not supplant the employees' right to the services of their representative with respect to Respondent's removal of unit work by sudden, unprecedented, unilateral action.

10 The fact that the Union was afforded an opportunity during contract negotiations to bargain with respect to subcontracting, though relevant to an assessment of whether the *Westinghouse* (*Mansfield Plant*) decision is controlling, does not independently satisfy Board requirements for a "waiver" of statutory rights. Here, that decision has been deemed inapposite on other grounds.

---

be a mandatory subject of bargaining before its implementation. If adverse effects are neither immediate nor foreseeable, bargaining ought not be compelled.

(footnotes omitted) Comment, *Automation and Collective Bargaining*, 84 Harv.L.Rev. 1822, 1839 (1971)

Even under this standard, Equitable would not have been required to bargain with the union in light of the absence of evidence regarding a direct or foreseeable adverse impact on the bargaining unit or its members.

(A. 17). We, on the other hand, need not address the subjects of waiver or conscious yielding. Our analysis requires no more than an evaluation of the union's opportunity to bargain, as one factor to be balanced in the overall determination of whether this subcontract was a subject of mandatory bargaining.[15] See Brockway, supra; Midland-Ross, supra.

Westinghouse clearly sets out the manner in which this last factor affects the ultimate balance. Westinghouse states:

> ... it is to be noted that no claim is made in this case that the Respondent has ever refused to honor a request for such bargaining; the sole issue before us is whether the Respondent transgressed its statutory obligation by not consulting with the Union about each of its thousands of annual subcontracting decisions which involved unit work. As one factor in the assessment of that specific issue, we take into account that the Union was in a position to, and in fact did, seek to negotiate adjustments in plant subcontracting policies. The relevant bargaining history thus shows, as already indicated, that the Union on three separate occasions sought contract language limiting the established subcontracting practice. Although discussion failed to produce agreement on such a provision, the

Union did win agreement for improved benefits in the area of employment security. The fact that the Union does have an opportunity to bargain generally on request about Respondent's recurrent subcontracting practices, provides in our view a contributing, though not a controlling, reason for not imposing upon the Respondent the duty to bargain separately, at the decision-making level, about each of the thousands of individual subcontracts covering working that could be performed by its own employees.

As the ALJ recognized, the union in this case had sought prohibitions against the subcontracting of unit work during the contract renewal sessions in 1969–70, 1971 and 1977. In each instance, Equitable was successful in resisting these demands, and thus the collective bargaining agreement which governed the conduct of the parties during this dispute neither restricted nor defined the company's right to subcontract work without prior notice to the union.[16]

There is a striking similarity between the bargaining history of Equitable and its union, and the history reflected in the Westinghouse opinion. Both in Westinghouse and here, the unions sought to negotiate adjustments in plant subcontracting policies. In both situations, the unions, on

---

**15.** The Press Co. Inc., 121 N.L.R.B. 976, 977–78 (1958), sets out the doctrine to which the ALJ adverted:

> It is well established Board precedent that, although a subject has been discussed in precontract negotiations and has not been specifically covered in the resulting contract, the employer violates Section 8(a)(5) of the Act if during the contract term he refuses to bargain, or takes unilateral action with respect to the particular subject, unless it can be said from an evaluation of the prior negotiations that the matter was "fully discussed" or "consciously explored" and the union "consciously yielded" or clearly and unmistakably waived its interest in the matter.

Whether or not the ALJ's finding that the union had neither yielded nor waived its interest in subcontracting can be sustained is irrelevant insofar as a Westinghouse analysis is concerned. Westinghouse does not require an explicit waiver or a conscious yielding as a part of its formula. We observe that if it did, there would be far less need to assess or balance the other four factors identified in Westinghouse.

As we read Westinghouse, it requires no more than an opportunity for the union to bargain generally about the employer's subcontracting practices. As we have stated in text, the union has exercised that opportunity since 1969, and indeed has finally succeeded in achieving its objective in the 1980 contract. See note 4, supra. Thus, in our view, the Westinghouse test as to this factor is less rigorous than the waiver test employed by the ALJ which, as we understand it, may exist as an independent ground for resolving a § 8(d) dispute. Because our analysis has proceeded along the Westinghouse track, a track which we believe the ALJ has also followed, we find no need to reach or decide any issue involving the union's waiver or "conscious yielding."

**16.** Fortifying our conclusion that the subcontracting issue properly belongs on the bargaining table is the information we received after the record was closed in this case that the current agreement between the parties includes a subcontract clause. See note 4, supra.

three separate occasions, sought to limit through negotiation, the employer's subcontracting practices. In both situations, the unions won agreement under succeeding contracts for improved benefits. It is not unlikely that "the relinquishment or continuation of [these] restrictions may well [have] constitut[ed] the *quid pro quo* for some other contract objective." *International Brotherhood, Local 249 v. Western Pennsylvania Motor Carriers Association*, 574 F.2d 783, 789 (3d Cir.), *cert. denied*, 439 U.S. 828, 99 S.Ct. 102, 58 L.Ed.2d 122 (1978).

We are aware, of course, that the opportunity to bargain is but one contributing factor to our overall analysis. Recognizing, however, that the union here, as in *Westinghouse* had, and continues to have, an opportunity to bargain generally respecting Equitable's subcontracting procedures, we find no reason to impose upon Equitable a duty to bargain separately about the instant Mellon subcontract.

### D.

We have discovered no substantial evidence on our independent examination of the record which would support a finding that the Mellon subcontract constituted a significant variation from Equitable's past established practices, or that it was motivated by other than economic considerations. Most importantly, we have found no substantial evidence that the Mellon arrangement had a "demonstrable adverse impact" on employees in the unit. To the contrary, the evidence is otherwise. Finally, the evidence is uncontroverted that the union had the opportunity to bargain, and did bargain, about changes in Equitable's "existing subcontracting practices at general negotiating meetings....", *Westinghouse, supra*, 150 N.L.R.B. at 1577.

The *Brockway* and *Midland-Ross* decisions, however, instruct us that at least in a partial closing context, even where the motivation is purely economic, "there is an initial presumption ... that a partial closing is a mandatory subject of bargaining." *Brockway, supra*, 582 F.2d at 735, *quoted in Midland-Ross, supra*, 617 F.2d at 982. *Brockway* has equated partial closing situations with subcontracting, and requires that the employees interests be balanced against those of the employer in order to resolve the duty to bargain. We need not devote extended discussion to such an analysis because we have already addressed each facet of the ALJ's findings which were adopted by the Board, and have found them wanting.

Although we recognize the employees' highly sensitive interest in job security, the record discloses that this interest has not been impaired. The record also shows that the employees have never been denied the right to be heard or negotiate over Equitable's subcontracting practices (*see* Section II C, *supra*, of this opinion). These two interests of the employees consequently have not suffered as a result of the Mellon arrangement. We acknowledge that the union has argued that bargaining over the Mellon contract would have permitted it to compete with Mellon insofar as costs of the remittance operation were concerned. Indeed, some suggestion appears that even though the expense would be substantial, a restructuring of the remittance office might have provided single-day banking if Equitable added a night shift and more armored car pickups.

The record, however, demonstrates that Equitable's concern has not been with costs [17] so much as it has been with increased efficiencies, updating of customer accounts, and the generation of a $700,000 daily cash flow. We cannot fail to recognize this concern when considering the operations of a gas company such as Equitable, in the context of our current energy difficulties.

As we have previously discussed, the record discloses no evidence of anti-union ani-

17. The Board's Brief admits that the record provides no reason to question Equitable's assertion that "the benefits it realizes from single-day banking make the comparative costs of processing bill payments at the bank or in-house a relatively unimportant factor." Brief for Board at 17.

mus. It does disclose, however, a compelling motivation centered entirely on the economic considerations to which we have just adverted. It also discloses that this type of subcontracting practice has not been foreign to Equitable's operations.

On balance, therefore, we have no hesitation in concluding that the employer's interests in the benefits that accrued to it and to its customers from the Mellon arrangement far outweigh any interest which could be asserted by the three former employees of the remittance office.

### III

■ The Board also affirmed the ALJ's conclusion that Equitable had committed an independent violation of Sections 8(a)(1) and (5) of the Act when it refused to furnish the union with a copy of the Mellon contract and underlying cost data relating to the arrangement. Our conclusion that the Mellon subcontract is not a mandatory subject of collective bargaining also disposes of these charges.

■ Information directly relevant to mandatory subjects of bargaining is regarded as "presumptively relevant", and must therefore be disclosed unless it is plainly irrelevant. *Western Massachusetts Electric Co., supra.* No obligation to provide information exists however, unless there is an obligation to bargain over the subject matter. *See International Shoe Company,* 151 N.L.R.B. 693, 699–700 (1965) (since union bargained away its right to require the company to negotiate transfer of work from bargaining unit, company is absolved from providing records pertinent to such a decision). Equitable therefore was not obliged to furnish the union with the information or documents it sought. The Mellon contract and cost data information were neither presumptively relevant nor demonstrably germane to bargainable issues. *See Western Massachusetts Electric Co., supra,* 573 F.2d at 105, 107; *International Telephone and Telegraph Corp. v. NLRB,* 382 F.2d 366, 371–72 (3d Cir.), *cert. denied,* 389 U.S. 1039, 88 S.Ct. 777, 19 L.Ed.2d 829 (1967).

As the court stated in *Western Massachusetts Electric Co., supra,* 573 F.2d at 110:

Just as a union cannot compel an employer to bargain over subjects that fall outside the ambit of "wages, hours, and other terms and conditions of employment," it cannot bootstrap a demand for information relating to these non-mandatory matters by its unilateral assertion of interest. Some action of the employer is necessary to make this kind of information relevant to bargaining.

■ Moreover, data regarding subcontracting costs where bargaining is not required, is relevant only when lower costs are urged by the employer as a motivating factor behind the subcontracting decision. Such a rule affords the union an opportunity to evaluate the Company's economic claims. *Western Massachusetts Electric Co., supra,* 573 F.2d at 107. *See also C–B Buick, Inc. v. NLRB,* 506 F.2d 1086, 1091 (3d Cir. 1974) (employer failed to bargain in good faith when it refused union's request for its financial data after employer had alleged it could not afford to accede to union demands).

As we have discussed in the preceding section of this opinion, the record here reveals that Equitable at no time asserted that the cost of contracting with Mellon to handle its customer remittance work was a factor in its subcontracting decision.

Thus, we do not agree with the ALJ's conclusion that the information and documents sought by the union were relevant. This being so, Equitable did not commit a violation of the Act by refusing to provide a copy of the Mellon contract or the cost data to the Union.

### IV

Our conclusion that Equitable did not violate Sections 8(a)(1) and (5) of the Act by refusing to bargain over its subcontracting agreement with Mellon and by refusing to furnish the union with a copy of that agreement obviates any need to discuss the Board's *status quo ante* order which, by reason of our disposition, will be denied enforcement.

Having reached the conclusions expressed in the foregoing discussion, we will grant Equitable's petition for review and deny the Board's cross-petition for enforcement.