ABC TRANS–NATIONAL TRANSPORT, INC., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 80–1155.

United States Court of Appeals, Third Circuit.

Argued Oct. 9, 1980.

Decided Feb. 19, 1981.

---

Edward N. Schwartz (Argued), East Orange, N. J., for petitioner.

Howard E. Perlstein, Atty., R. Michael Smith, Atty. (Argued), N.L.R.B., Washington, D. C., William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D. C., for respondent.

Before ALDISERT, GARTH and VAN DUSEN, Circuit Judges.

## OPINION OF THE COURT

GARTH, Circuit Judge.

ABC Trans-National Transport, Inc. has petitioned us to review an order of the National Labor Relations Board which determined that ABC had violated Sections 8(a)(1) and (5) of the National Labor Relations Act by refusing to bargain collectively with its union. Truck Drivers, Chauffeurs and Helpers Local Union No. 100, about a decision to close one of ABC's 35 freight forwarding terminals. The Board has filed a cross-application for enforcement of its order. We affirm the Board's findings and conclusion as to ABC's liability, and therefore deny ABC's petition for review. We must also deny the Board's petition for enforcement of its order, however, inasmuch as it requires ABC to engage in the futile task of bargaining over its decision to close the terminal, the operation of which was shut down on July 21, 1978.

### I.

ABC Trans-National, a subsidiary of ABC Freight Forwarding, is a Delaware corporation engaged in the business of freight forwarding and in the transportation of freight, by motor carrier, within and between various states of the United States.[1] ABC operates terminals in approximately 35 cities. The company's drivers typically

---

1. ABC is an employer within the meaning of § 2(2) of the Act, and is engaged in commerce and in operations affecting commerce within the meaning of §§ 2(6) and (7) of the Act. The union is a labor organization within the meaning of § 2(5) of the Act. 29 U.S.C. § 152 (1976).

pick up freight in the city in which a terminal is located, bring it to the company's dock, where it is then delivered by the company's local drivers to a destination within the city's limits. One of ABC's terminals was located in Cincinnati, Ohio. Prior to its closing, ABC had operated this terminal for approximately 25 years. During this entire period, ABC's truck drivers and dockmen were represented by the Truck Drivers, Chauffeurs and Helpers Local Union No. 100, an affiliate of the International Brotherhood of Teamsters. The five truck drivers[2] and two dockmen employed by ABC at the Cincinnati terminal at the time of its closing were covered by a collective bargaining agreement which was effective from April 1, 1976, through March 31, 1979.[3]

At the commencement of the proceedings before the Administrative Law Judge, counsel stipulated that ABC's decision to close the Cincinnati terminal was solely an economic decision (Tr. 6). Union Steward Cletus Leon also testified that business at the terminal during the past eight or nine years had continually worsened (Tr. 67). Thus, there is no suggestion that ABC's decision to close the terminal was motivated by any anti-union animus.

On July 14, 1978, Allen Brown, a Vice-President of ABC, telephoned ABC's District Manager Frank Conte and told him that ABC had decided to close the ABC Cincinnati operations and that, as of July 21, the terminal would be closed. Brown also told Conte to communicate this information to the Union. On that same day, Conte telephoned Robert Sturgill, the union's business agent, and related this development to him. Conte testified that he told Sturgill that as of July 21, ABC intended to terminate its operations in Cincinnati and lay off the employees, and that the compa-

ny would take care of the vacations and sick days that were due (Tr. 24).

Following Conte's conversation with Sturgill, Conte sent Sturgill a letter confirming the substance of their conversation. This letter, dated July 14, was received into evidence as General Counsel's Exhibit No. 2. It read:

This letter is to confirm my telephone call on July 14, 1978, notifying you that ABC TRANS NATIONAL TRANSPORT, INC. will close terminal operation in Cincinnati, Ohio, at the close of business July 21, 1978.

All positions covered by the agreement presently in effect are abolished with the close of business July 21, 1978.

On July 17 or 18, 1978, Odell Hinkle, the union's Secretary-Treasurer, telephoned Edward N. Schwartz, ABC's attorney on this appeal, but the evidence is in conflict as to whether Schwartz had informed Hinkle during this conversation that the company would bargain over its decision to close. In support of the union's position that Schwartz neither offered nor intended to bargain over the decision itself, the General Counsel introduced three letters from ABC's counsel to the union. Each of the letters spoke only in terms of ABC's willingness to bargain over the *effects* of the closing.

The ALJ's opinion recites that just prior to July 21, 1978, ABC Freight Forwarding, the parent company of ABC Trans-National, purchased Acme Fast Freight, one of ABC's competitors. It goes on to state:

Upon the closing of Respondent's terminal, Conte became terminal manager at Acme Fast Freight. Respondent's former bookkeeper and salesman were also employed by Acme. In its operation

---

2. The testimony before the Administrative Law Judge revealed a discrepancy regarding the number of drivers. ABC's District Manager Frank Conte stated that four drivers were employed (Tr. 15), but Cletus Leon, one of the drivers, testified that five drivers were employed (Tr. 53). The Administrative Law Judge made a finding of fact that ABC employed five

truck drivers, which finding was excepted to by ABC.

3. Article 8 § 6(d)(1) and (2) of that agreement discuss partial closings, closing of terminals, and transfer of work. The effects of such closings are fully delineated but neither subsection imposes a duty on the company to bargain about the closing decision itself.

Acme does not employ truckdrivers but contracts out that function.[2]

[2] There is no allegation or contention that Respondent violated 8(a)(3) of the Act by closing its terminal, nor is there any claim that Acme became a successor employer.

Opinion of the ALJ at 3–4.

The ALJ's opinion identifies the sole issue to be determined: whether ABC had refused to bargain over its decision to close the terminal, as distinguished from ABC's willingness to bargain about the effects of the closing. The ALJ stated:

> The sole issue herein is whether Respondent failed and refused to bargain about its decision to close its Cincinnati terminal as a result of which its employees were discharged. It is conceded that the shutdown was for economic reasons and further that Respondent offered to bargain concerning the effects of the closing upon its employees.

Opinion of the ALJ at 4.

The ALJ thereafter concluded that ABC had violated Sections 8(a)(1) and (5) of the Act by failing and refusing to bargain with the union in good faith over its decision to close the Cincinnati terminal. His order required ABC to bargain with the union over its decision to close the terminal and to make the employees who were discharged

4. The order required backpay from the date of the closing until the date of bargaining over the decision to close. *See* Part III, *infra.*

5. For example, the Board ordered that if ABC reopens the Cincinnati terminal, it must offer to reinstate the unit employees to their former, or substantially equivalent, positions. The Board also ordered that ABC preserve and make available to the Board, upon request, certain records necessary to determine the amount of backpay due under the order.

Following the ALJ's decision, ABC moved to reopen the record so that the affidavit of its Vice-President, Marvin Barsky, dated October 12, 1979, and a copy of a grievance, dated July 28, 1978, regarding the closing of the terminal, could be considered a part of the record. The Barsky affidavit details Barsky's attempts to settle the grievance, which had been filed by Odell Hinkle. A decision was rendered in favor of ABC some time in September, 1979, during the third step of the grievance procedure, and the union's grievance was dismissed. The union and the General Counsel filed motions before the Board to strike the Barsky affidavit and grievance, on the grounds that there was

whole for earnings lost since July 21, 1978.[4] On January 11, 1980, the Board affirmed the ALJ's rulings, findings, and conclusions, and adopted the ALJ's order with a few minor modifications.[5]

ABC's petition for review presents essentially two questions for resolution: (1) is there substantial evidence on the record as a whole to support the Board's finding that the company violated Sections 8(a)(1) and (5) of the Act, 29 U.S.C. § 151 et seq. (1976), by failing to bargain with the union about its decision to close the Cincinnati freight terminal? (2) if so, should we enforce the Board's order requiring ABC to bargain?

## II.

ABC argues on appeal that there is not substantial evidence on the record as a whole to support the Board's finding that it refused to bargain with the union over its decision to close the Cincinnati terminal. ABC also claims that even if it did not adequately advise the union of its intention to close the terminal, the decision to shut down the terminal does not constitute a mandatory subject of bargaining under the circumstances present here.[6] We will deal with these contentions in reverse order.

no evidence that Barsky was unavailable on the date of the hearing before the ALJ; the alleged incidents referred to in the affidavit were not newly discovered; the September 1979 grievance resolution raises issues irrelevant to the instant proceeding; and ABC's motion to reopen the record did not comply with the Board's Rules and Regulations. The Board denied ABC's motion to reopen the record, and granted the motions of the General Counsel and the union to strike the affidavit and the grievance.

A copy of the Barsky affidavit was attached as part of the Appendix to ABC's Reply Brief. Prior to the argument in this case, but after the Reply Brief had been filed with the court, the Board filed a motion to strike the affidavit from the Appendix to Petitioner's Reply Brief on the ground that it is not a part of the record. That motion was granted.

6. ABC also argues that the union waived any requirement by the company to bargain over its decision to terminate the operations of its Cincinnati terminal. We cannot discern from any of the briefs or the record before us whether

## A.

Within the past few weeks, our court has reviewed the legal principles pertinent to "mandatory subjects of bargaining" which arise in a Section 8(d) setting.[7] In *Equitable Gas Co. v. NLRB*, 637 F.2d 980 (3d Cir. 1981)[8] a case involving a subcontract of customer remittance work which had been previously performed by bargaining unit employees, we reaffirmed our adherence to the balancing approach announced in *Brockway Motor Trucks v. NLRB*, 582 F.2d 720, 731 (3d Cir. 1978):

> Thus, it is now settled in the jurisprudence of this Circuit that when issues of subcontracting and partial closings are confronted in the context of the National Labor Relations Act, an initial presumption arises that they are mandatory subjects of bargaining. Applying the balancing analysis formulated in *Brockway*, this presumption can be overcome only if it appears that the employer's interests outweigh the union's interests in a given situation.

*Equitable, supra*, at 987. We concluded in *Equitable* that the company's subcontract of customer remittance work to a bank, under the circumstances present in that case, was not a mandatory subject of collective bargaining, and thus *Equitable* had not violated the Act by refusing to bargain.

As we have observed, *Equitable* was a subcontract case and did not involve a partial closing, which is the situation here.

Nevertheless, *Brockway, supra*, which did involve a partial closing, took pains to equate both practices, and for purposes of analysis, found that no distinction exists between subcontracting, on the one hand, and a partial closing, on the other. Thus, in the present partial closing setting, we are free to draw upon the teachings found in both categories of cases.

Our examination of the relevant authorities reveals that in partial closing (and subcontracting) cases, the courts have focused on the following considerations: (1) whether the decline in profitability prompting a company's decision to close, or to subcontract, a portion of its operations was precipitous or gradual; (2) whether there has been an adverse impact on the employees by virtue of their employer's decision; (3) whether the union might have provided any constructive input relating to the company's decision; (4) whether notice to, and bargaining with, the union would have hampered the company's sale of its facility or forced it to forego an advantageous arrangement; and (5) whether the decision to close, or to subcontract, had been a subject of negotiation at the bargaining table.

Obviously, our detailing of these considerations is not all-inclusive. Depending upon the particular business, or circumstances giving rise to either the subcontract or partial closing decision, other factors may assume greater prominence.[9]

---

ABC raised this argument before the ALJ, and we are therefore reluctant to discuss this issue at length. We note that neither the ALJ nor the Board addressed the waiver issue, an issue which should, in the first instance, be determined by the Board. Our review of the record, however, discloses that one week before the actual closing, the union was informed that ABC "*will* close terminal operation[s] in Cincinnati, Ohio, at the close of business July 21, 1978." General Counsel's Exhibit No. 2. (emphasis supplied). We find it difficult to understand how the union can be regarded as having waived the right to request bargaining over a decision which had been announced as final. *See, e. g., ILGWU v. NLRB*, 463 F.2d 907, 918-19 (3d Cir. 1972) ("Notice of a *fait accompli* is simply not the sort of timely notice upon which the waiver defense is predicated."). Of greater importance, however, is that the record, in our opinion, does not reveal that ABC

carried its burden of demonstrating an unequivocal waiver by the union. *See, e. g., The Press Co. Inc.*, 121 N.L.R.B. 976, 977–78 (1958).

**7.** Section 8(d) of the National Labor Relations Act defines collective bargaining as "the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment. . . ." 29 U.S.C. § 158(d) (1976).

**8.** This decision was filed on January 13, 1981, and thus was not available at the time that argument was heard in the present case.

**9.** In *Equitable*, we employed a five factor approach mirroring the analysis found in *Westinghouse Electric Corp.* (Mansfield Plant), 150 N.L.R.B. 1574, 1577 (1965):

680

## B.

We recognize that ABC was not motivated by any anti-union animus in closing its Cincinnati terminal. We also acknowledge that the parties had stipulated that the shutdown of the terminal was due solely to economic considerations. Similar non-disputed motivations, however, have not prevented our court from holding an employer to the duty of bargaining over a partial closure, particularly where the economic considerations are not explained or where the economic decline responsible for the closing was not precipitous.

In *Brockway, supra,* the company had closed down its Philadelphia plant while continuing operations in other areas. It was not disputed that the closure was based solely on economic considerations. The Court observed, however, that the record did not explain "the nature, extent, or history of the considerations prompting the employer's decision to close its Philadelphia plant," 582 F.2d at 723. In particular, the court noted that no reference appeared in the record to "economic necessity as a basis of the decision." *Id.* Absent such evidence, the court held that a partial closing constitutes a mandatory subject of bargaining.

In *Electrical Products Division of Midland-Ross Corp. v. NLRB,* 617 F.2d 977 (3d Cir. 1980), we held that the Board was warranted in finding that the employer had violated the Act when it refused to bargain about closing one of its two plants. The evidence in that case disclosed that the

plant had operated unprofitably for some time, and consequently there was no immediacy to the employer's decision to close without consulting the union. In February, 1976, Midland-Ross had commenced a study of the economic status of the facility that it eventually closed. By April, 1976, the study revealed that the plant's economic future was not promising. On June 4, 1976, pursuant to a recommendation made by the employer's controller, closure was approved. The plant was finally closed on July 1, 1976. The court, while discussing the importance of other factors, observed that "there is nothing in all of the evidence that [the plant] was so unprofitable that the employer had to close immediately without consulting the Union." *Id.* at 982. The court went on to state that no reason had been shown why the union could not have been notified at some point during the six months preceding the closing.

On the other hand, in *NLRB v. Royal Plating and Polishing Co., Inc.,* 350 F.2d 191, 196 (3d Cir. 1965), this court held that "an employer faced with the economic necessity of either moving or consolidating the operations of a failing business has no duty to bargain with the union respecting its decision to shut down." In that case, the company was forced to shut down one of its plants since, had it refused, the Housing Authority could have forced a sale through the use of its condemnation power.[10]

In *Equitable, supra,* we also addressed the factor of employee dislocation at some

---

*Westinghouse,* . . . does not support a duty to bargain where the employer's unilateral action in subcontracting satisfies the following five criteria: (1) the recurrent subcontracting is motivated solely by economic considerations; (2) it comports with the company's traditional methods of conducting its business operations; (3) it does not vary significantly from prior established practices; (4) it does not have a demonstrable adverse impact on employees in the unit; and (5) the union had the opportunity to bargain about changes in existing subcontracting practices at general negotiating meetings.
*Equitable Gas Co. v. NLRB,* 637 F.2d 980 at 987 (3d Cir. 1981).

Three of the five factors discussed at length in *Westinghouse* are peculiar to the practice of

subcontracting, and therefore have little direct relevance to a partial closing situation where one of 35 terminals is closed, as is the case here.

10. In *Equitable, supra,* in addition to other factors analyzed, we discussed the importance of the economic motivation for the company's decision. In that case, however, our holding that no duty to bargain existed was not predicated on a finding that the economic decline was precipitous, but rather on the fact that by entering into the subcontract, Equitable could generate an additional $700,000 per day in available hard cash, an advantage which could not have been duplicated by Equitable's in-house employees.

length. We there characterized that factor as one of the most critical to be considered in determining whether a subcontracting decision constitutes a mandatory subject of bargaining.[11] *Brockway* too recognized the importance of this criterion in the context of a partial closing: "[J]ust as subcontracting is likely to lead to the termination of employment, so, too, will the closing down of an employer's plant. . . ." *Brockway, supra,* 582 F.2d at 735.[12] *Brockway* continued:

> Of chief concern to the employees is the prospect of losing their jobs. It is in fact difficult to imagine any result of a decision by the employer about which labor would be more highly sensitized.[87]
>
> [87] The NLRB well expressed the nature of the employees' interest in a partial closing determination in *Ozark Trailers,* note 43 *supra,* 161 N.L.R.B. at 566:
>
> > For, just as the employer has invested capital in the business, so the employee has invested years of his working life, accumulating seniority, accruing pension rights, and developing skills that may or may not be salable to another employer. And, just as the employer's interest in the protection of his capital investment is entitled to consideration in our interpretation of the Act, so too is the employee's interest in the protection of his livelihood.
>
> *Id.* at 735.

In *Midland-Ross Corp., supra,* two other considerations which persuaded the court to hold that the employer had a duty to bargain over the partial closing were that bargaining would have advanced the union's interest, and there was no suggestion that bargaining with the Union would have hampered the employer's decision to close its allegedly unprofitable plant:

> Here, we note that bargaining would have vindicated the union's interest.

Even if the Ceramics Workers could not have helped to keep Del-Val open, it could have at least tried to make suggestions that would minimize the closing's effect on the employees, such as transfer of work, minimizing customer withdrawals, and so forth.

617 F.2d at 982.

*Brockway, supra,* also addressed these two factors in dealing with the subjects of whether the company's freedom in making managerial decisions would be "unacceptably constrained by bargaining", and whether the company's negotiations with some third party would have been impaired. 582 F.2d at 738. Similarly, *Equitable* considered whether bargaining could have, in any way, furthered the employees' interests in a manner which would have still accommodated the company's concerns.

In each instance, the particular evidence dictated the manner in which the court treated the factor under consideration. In *Midland-Ross, supra,* the company was ordered to bargain when, among other determinations, the court concluded, for the reasons to which we have just adverted, that bargaining would have vindicated the union's interest. In *Brockway,* the court discounted the claims that the company's freedom would be hampered by bargaining, because no such evidence appeared of record. In *Equitable,* the record disclosed that even had the union been advised of the subcontracting arrangement, no modification could have been suggested which would have constituted a viable alternative to the subcontract arrangement. Indeed, the evidence in *Equitable* was completely to the contrary.

---

11. All of the employees affected by Equitable's subcontracting arrangement obtained other positions in the company. These positions were equivalent to or higher paying than their former positions. None of the employees were discharged.

12. Although the number of employees whose jobs were terminated by Brockway's closing of its Philadelphia plant were not revealed in the opinion, it is apparent that all of the Philadelphia workers were discharged. *See Brockway Motor Trucks v. NLRB,* 582 F.2d 720, 722 23 n.2, discussing the reinstatement of the em-

ployees to their former jobs if the Philadelphia operation was to be resumed.

Similarly, although no specific employee dislocation is discussed in *Electrical Products Division of Midland-Ross Corp. v. NLRB,* 617 F.2d 977 (3d Cir. 1980), it is apparent from a reading of that opinion that a closing of the Del-Val plant resulted in the termination of the Del-Val employees. *See id.* at 981 n.2, which refers to the transfer of some of the employees from the closed Del-Val plant to the continuing Nylomatic facility.

682

Finally, we refer to the consideration which courts have given to whether the union had an opportunity to negotiate at the bargaining table over the company's decision to close or to subcontract. This consideration is no more than "one factor to be balanced in the overall determination of whether [a partial closing is] a subject of mandatory bargaining." *Equitable, supra,* at 991. As *Westinghouse Electric Corp. (Mansfield Plant),* 150 N.L.R.B. 1574, 1577 (1965) states:

> The fact that the Union does have an opportunity to bargain generally on request about [the company's closing] provides in our view a contributing, though not a controlling, reason for not imposing upon the [company] the duty to bargain separately, at the decision-making level, about [a partial closing].

This factor was also mentioned in *Brockway, supra,* although the evidence in that case revealed that "the employer's action occurred in the absence of prior discussion." 582 F.2d at 728. In *Midland-Ross,* however, no reference was even made to this consideration. In *Equitable, supra,* on the other hand, this factor assumed great significance. There we emphasized the fact that although the union had sought prohibitions against subcontracting of unit work during contract renewal sessions in 1969–70, 1971 and 1977, Equitable had continually resisted these demands, with the result that it was not until the 1980 collective bargaining agreement that the company capitulated and limited its right to subcontract.

### C.

As we have previously stated, an initial presumption arises that a partial closing is a mandatory subject of bargaining. This presumption, we have held, can be overcome on a balancing analysis only if it appears that the employer's interests outweigh the interests of the union. We conclude that on this record, ABC has not overcome this presumption. Thus, ABC had an obligation to bargain with the union when it decided to shut down its Cincinnati terminal.

ABC argues that it had no such duty because: (1) there was no evidence of anti-union animus; (2) there was evidence of a change in the economic direction of the company and a basic operational change; (3) the company did not close its terminal and substitute non-unit workers for those displaced; (4) no evidence exists that the work performed by ABC at the Cincinnati terminal is now being performed by the company elsewhere; (5) no evidence exists that ABC had closed its terminal to avoid contractual obligations with the union; and (6) ABC had introduced evidence that it offered to meet and bargain with the union concerning both the decision and the effects of the closing.

Leaving aside, for the moment, ABC's claim of its willingness to bargain with the union over the closing decision itself, *see* discussion *infra* on this issue, we do not find any of the above contentions persuasive in view of two critical factors. First, although it is undisputed that ABC's decision to close the Cincinnati terminal was solely an economic decision, and thus not motivated by any anti-union animus, the decision to close was not a matter of immediate necessity. Instead, it was made in response to the terminal's economic deterioration during the previous eight or nine years (Tr. 67). We are therefore not reviewing a situation involving a sense of urgency, such as in *Royal Plating, supra,* which, if present, would have weighed heavily in the company's favor in determining if it had a duty to bargain. In fact, ABC's economic motivation appears no different than the economic basis asserted by Midland-Ross as a reason for closing its facility, a decision which this court held had to be bargained. Second, and perhaps even more significant, is the fact that nearly all of the employees in the ABC bargaining unit lost their jobs as a result of the Cincinnati closing. Indeed, all of the drivers and dockmen were discharged. Only the terminal manager, a bookkeeper and a salesman were offered substitute employment by Acme. Thus, the very evident adverse impact upon ABC's Cincinnati employees distinguishes ABC's

circumstance from that of Equitable, none of whose employees were discharged. Although it may be true that ABC had neither substituted non-unit workers for those displaced, nor deliberately sought to perform its Cincinnati work elsewhere, this cannot be said to mitigate the adverse impact on the workers who were discharged.

Briefly examining the other criteria which we have previously discussed, we observe that the record here reveals no evidence respecting closings as a subject of collective bargaining. All that appears are the general provisions of the collective bargaining agreement which concern, at the most, the *effects* of the closing. The agreement is silent regarding the company's duty to bargain over a decision to close. *See* note 3, *supra.* Lastly, ABC has not directed our attention to any evidence which would suggest that had the union been consulted, it still would not have been able to dissuade the company from closing the Cincinnati terminal.[13] On balance, therefore, we cannot say that any of the interests asserted by ABC are of a sufficient magnitude to tip the scales in its favor. Having failed to overcome the presumption that a partial closing requires bargaining with the union, we hold that under the instant circumstances, ABC had a duty to bargain over its decision to close its Cincinnati terminal.[14]

### D.

ABC also argues that the record does not contain sufficient evidence to support the ALJ's finding that ABC, "by failing and refusing to adequately advise the union of its intention to close its Cincinnati terminal and by unilaterally closing such terminal and discharging its employees, violated 8(a)(1) and (5) of the Act and thereby failed and refused to bargain in good faith." Opinion of the ALJ at 5. The ALJ found, and the Board affirmed, that notwithstanding the seven days advance notice of the closing which the company afforded the union.

[i]t is clear from the actions of Respondent and counsel that it was not offering nor was it willing to bargain concerning a

---

**13.** In its Brief, the Board states:

"Bargaining with the union before the decision to close was final might have produced the very economic proposals—such as a voluntary wage reduction or recommendations for more efficient utilization of manpower or equipment—which would have enabled the company to remain in business in Cincinnati."

Brief for NLRB at 10.

**14.** The Second Circuit has developed a somewhat different approach for determining whether a partial closing is a mandatory subject of bargaining. For example, in *NLRB v. First National Maintenance Corp.*, 104 L.R.R.M. 2924 (2d Cir. 1980), *cert. granted,* —— U.S. — · ·, 101 S.Ct. 854, 66 L.Ed.2d 798 (1981), the court concluded that a company in the business of providing cleaning and maintenance services to commercial customers had a duty to bargain over the termination of operations of one of the nursing homes it was servicing. It so held because there was "sufficient reason to believe that, given the opportunity, the union might have made concessions, by accepting reduction in wages or benefits (take-backs) or a reduction in the work force, which would in part or in whole have enabled [the nursing home] to give First National Maintenance an increased management fee." *Id.* at 2929.

In reaching that conclusion, the court agreed with *Brockway, supra,* that with regard to partial closings, "the correct approach is to establish a presumption that a duty to bargain exists," but the court did not agree with *Brockway's* emphasis on balancing the respective interests of the employer and employees in bargaining. The court declared:

We believe that the determination whether to impose a duty to bargain should not depend on the relative injury to the employer and employees, but rather on the relative merits of the arguments put forth as to those classic considerations of whether the purposes of the statute are furthered by the decision to impose a duty to bargain in a particular case. *Id.* at 2928. In enumerating several instances in which the employer could overcome this presumption, the Second Circuit noted several of the considerations to which we advert, notably, whether bargaining over the decision would be futile or whether it might modify or reverse the employer's decision, whether the closing was due to emergency financial circumstances, and whether forcing the employer to bargain would endanger the vitality of the entire business. *Id.* at 2928. Thus, although the Second Circuit frames the issue in terms of furthering the statute's purposes, it nevertheless considers and weighs the same factors as we do in the balancing approach articulated in *Brockway, supra.*

decision which had previously been made. Thus, the union was confronted with *a fait accompli* and was not afforded the opportunity to bargain during the critical time when such bargaining perhaps could have been productive, that is, the period when the decision was being considered and about to be made.[15]

Based on our review of the record, we conclude that even if we might have reached a different conclusion independently, there is substantial evidence in the record as a whole to support the ALJ's findings. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Findings of an ALJ, if supported by substantial evidence, must be given conclusive effect on our review.

In *Eastern Engineering & Elevator Co., Inc. v. NLRB,* 637 F.2d 191 (3d Cir. 1980), a decision filed after argument was heard in this case, our court commented upon the weight to be accorded to credibility findings of an ALJ:

> The Supreme Court has directed us to recognize that an ALJ's findings of fact constitute a vital part of the whole record that the court must review. These findings "are to be considered along with the consistency and inherent probability of testimony. The significance of his report . . . depends largely on the importance of credibility in the particular case." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 496, 71 S.Ct. 456, 468 (1951). We must "recognize that evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion." *Id.*

*Id.,* slip op. at ——. The controversy in *Eastern Engineering, supra,* centered around a Board decision which had refused to give credit to the ALJ's credibility findings. This court refused to enforce the Board's order. We did so because we found no evidence to support the Board's conclusion that the Act had been violated by the

company when it laid off an employee. The ALJ found that *Eastern* had established a non-pretextual, legitimate business reason for laying off the affected employee. He further found that *Eastern* had not been motivated by an internal union charge which the laid-off employee had filed against a fellow worker. The ALJ made these findings, almost wholly, on the basis of demeanor and credibility evaluations. Despite this, and despite the fact that the Board had no opportunity to hear or see the witnesses, the Board overturned the ALJ's findings. Judge Aldisert, writing for the court, explained the deference to be given to "credibility resolutions of an experienced and impartial administrative law judge." *Id.,* slip op. at 20. He referred approvingly to Judge Wallace's opinion in *Penasquitos Village, Inc. v. NLRB,* 565 F.2d 1074, 1078 (9th Cir. 1977), which discussed the important aspects of a witness' demeanor, and then referred to the weight which must be accorded an ALJ's determinations of credibility. Judge Aldisert stated:

> Weight is given the ALJ's determinations of credibility because he or she "sees the witnesses and hears them testify, while the Board and the reviewing court look only at cold records." *NLRB v. Walton Manufacturing Co.,* 369 U.S. 404, 408, 82 S.Ct. 853, 855, 7 L.Ed.2d 829 (1962) (per curiam).

*Id.,* slip op. at 14–15.

We recognize, of course, that in *Eastern Engineering, supra,* this court reversed the Board which had earlier rejected the ALJ's credibility findings, whereas here, we are in the position of assessing the ALJ's determinations and their subsequent affirmance by the Board.

We discern, from our reading of the record, that the ALJ here was confronted with conflicting testimony as to what had transpired in July, 1978. The statements of the various witnesses, as might be expected, reflect their respective interpretations of the situation. In particular, the evidence reveals conflicting testimony by Odell Hin-

---

15. Opinion of ALJ at 5.

kle and Edward Schwartz regarding their conversation on July 17, 1978.

After making several contradictory statements, Hinkle finally admitted that Schwartz *could* have said the Company would be willing to meet with the union people and discuss "whatever problems there *were*" (Tr. 93), but then added that the problems referred to in that conversation concerned "what may or may not happen *after* the terminal closed" (Tr. 94).

Schwartz testified that he said to Hinkle during the above conversation that the "Company was willing to sit down and bargain concerning any question or any problem that the Union had" (Tr. 103). Schwartz stated that Hinkle replied: "Well, we have an attorney. I will have to discuss it with him and I'll get back to you" (Tr. 103). Schwartz also testified that although Hinkle never called him back, he (Schwartz) attempted to call Hinkle again "in order to set up a meeting with respect to any problem that they might have had or anything they desired to speak about" but was "unable to do so" (Tr. 103). On cross examination, Schwartz again stated that he would have been willing to discuss anything that the union wanted to, and that the discussions would not have been "limited to closing" (Tr. 104). When asked whether he specifically told Hinkle that he could discuss ABC's decision to close its terminal, Schwartz replied, "my letters had indicated that" (Tr. 104). In response to the ALJ's question, "[Y]ou just said . . . that you said you would be willing to discuss anything they wanted to discuss. Are those the words that you used in the telephone call that Hinkle made to you?" (Tr. 105), Schwartz flatly answered "yes".[16]

In support of its position that ABC never intended to bargain over the decision to close the terminal, the General Counsel introduced three letters as Exhibits Nos. 3, 4 and 5 at the hearing before the ALJ. The first was a letter from Burton R. Horowitz,

another company attorney, to G. F. Kaiser of the union, dated July 17, 1978. That letter read:

> Please be advised that we represent the above named company [ABC] located at 1441 Springfield Avenue, Cincinnati, Ohio.
>
> As you have been advised by our representative Mr. Conti [sic] in Cincinnati, the company intends to shut down it [sic] operation in that City. We would appreciate hearing from you, if you so desire, to negotiate the *effects* of the shutdown on the employees of A B C TransNational.

General Counsel's Exhibit No. 3 (emphasis supplied). The other two letters were sent by Schwartz to Robert Sturgill. One letter, dated July 19, 1978, and received on July 21, 1978, stated:

> Please be advised that we represent the above named company.
>
> In line with the company's intention to terminate its terminal operation in Cincinnati, the company is willing to meet and bargain with you concerning the *effect* of the closing upon the employees.
>
> If you are so inclined, please contact this office so that a mutually convenient date can be arranged.

General Counsel's Exhibit No. 4 (emphasis supplied). The second of these letters was dated July 26, 1978, and read:

> I returned your telephone call on today's date and you failed to call me back.
>
> My offer of July 19, 1978 still stands to meet and bargain concerning the *effect of* the closing on the employees.

General Counsel's Exhibit No. 5 (emphasis supplied).

The ALJ, by his findings, apparently did not credit the testimony of Schwartz that the company intended to bargain *over* the decision to close the terminal. We will not reject his credibility findings in this regard,

---

**16.** We are aware that Schwartz, as ABC's counsel on appeal, argues the merits of his own testimony taken *before* the ALJ. We have been shown no reason why this fact should require us to evaluate Schwartz's testimony any differently than the other witnesses, particularly since neither the ALJ nor the Board made any comment respecting Schwartz's dual role as a witness and an attorney.

particularly in light of the three letters sent by ABC's counsel to the union which state, in no uncertain terms, that ABC was willing to bargain over the *effects* of the decision to close the terminal. None of the letters mention a willingness on the part of ABC to bargain *over* the decision itself.

Having so recently been counselled by the court in *Eastern Engineering supra,* that ALJ findings should be given great deference, particularly when they are based on demeanor testimony, as they are here, we are satisfied that the findings made by the ALJ, and affirmed by the Board, that the company refused to bargain over its decision to close the Cincinnati terminal are amply supported by substantial evidence.

## III.

### The Board's Order

■ Concluding that ABC had violated Sections 8(a)(1) and (5) of the Act, we must determine the propriety of the Board's remedial order. The ALJ's order required ABC to bargain with the union over its decision to close the Cincinnati terminal and to pay the employees who were discharged for earnings lost since July 21, 1978, the date of the closing. The ALJ also ordered that the affected employees be paid to the date of bargaining over the decision to close. The Board affirmed this remedy.

ABC now argues that since ABC "has ceased all operations in the City of Cincinnati and has no other terminal within 250 miles of its former Cincinnati terminal", requiring ABC "to bargain about its decision to close at this time would be requesting it to engage in a meaningless and fruitless act." [17]

Our court was confronted with a similar situation in *Brockway, supra.* The remedial order in that case required:

> Brockway to bargain, upon request, with the union about the decision to close the Philadelphia facility and about "the possible resumption thereof." Further, it provides that if the employer agrees to resume its Philadelphia operations, "it shall

offer all those in the appropriate unit reinstatement to their former jobs" or, if such jobs no longer exist, to substantially equivalent positions. The order also provides that backpay shall be awarded for the period from the date of the employees' termination to the date Brockway begins to bargain with the union in good faith or until the employees are offered reinstatement, "whichever occurs first, less net earnings during such period..."

582 F.2d at 722–23 n.2. The court, after holding that the company's decision to close one of its plants for "unspecified economic considerations" was within the sphere of mandatory bargaining, refused to enforce the above bargaining order on the grounds that to do so would require the company to engage in a futile activity:

> A difficulty with ordering bargaining in this case has become evident from an uncontradicted statement at oral argument that, in the interval since the NLRB issued its direction in this matter, Brockway has ceased all of its truck-related business operations. If that is correct, and we are unable to determine with exactitude whether it is or not, then it would appear that to require bargaining with the union at this time regarding the decision to close the Philadelphia plant would constitute a futile act. For if Brockway is entirely out of business, it would be most unlikely to undertake to reconsider its earlier determination to close the Philadelphia facility. There is no apparent purpose in directing a meaningless activity and, indeed, there is a strong policy in favor of limiting enforcement of the Board's orders to situations where it would not be fruitless.[108]

108. *Cf. NLRB v. Winn-Dixie Stores, Inc.,* 361 F.2d 512, 517 (5th Cir. 1966) ("While there was a duty on the part of Winn-Dixie to consult and bargain with the Union as the employees' representative before discontinuing its cheese cutting and prepackaging operation at its Jacksonville warehouse, we do not think at this late date it should be required to bargain with the Union as to its reestablishment. That, because under the facts proven by un-

17. Brief for ABC at 11.

contradicted evidence, we think Winn-Dixie, for good and sufficient reasons, would undoubtedly refuse to reestablish such operation and that to bargain with respect to such reestablishment would be a 'mere exercise in futility.' ").

*Id.* at 740. Although we refused to enforce the entire bargaining order in *Brockway,* we did so "without prejudice to the NLRB to commence additional proceedings should it seek to do so." *Id.* at 741. We therefore left open the possibility of the Board ordering another remedy after further factual development of the futility issue in proceedings before the Board.

The record in the instant case does not provide us with a basis to depart from the *Brockway* "futility" formula. Indeed, the two situations in this respect appear to us to be very similar. We will therefore deny enforcement of the Board's order on the ground that it requires ABC to engage in a seemingly futile task. As in *Brockway,* however, our decision to deny enforcement will be "without prejudice to the NLRB to commence additional proceedings should it seek to do so." *Id.*

## IV.

We therefore hold that ABC's decision to close its Cincinnati terminal constituted a mandatory subject of bargaining, and by failing to bargain, it violated Sections 8(a)(1) and (5) of the Act. Accordingly, we will deny ABC's petition for review.

We will also deny the Board's petition to enforce its bargaining order since to hold otherwise would require ABC to engage in a futile activity.

Each party will bear its own costs.